Bessie J. STRONG, Administratrix of the Estate of Carl R. Strong, deceased, Appellant,

v.

E. I. DuPONT de NEMOURS CO., INC., a corporation, Appellee,

Nebraska Natural Gas Co., a corporation, Norton McMurray Manufacturing Company, a corporation, and Louise T. Hammond.

Bessie J. STRONG, Administratrix of the Estate of Carl R. Strong, deceased, Appellant,

v.

E. I. DuPONT de NEMOURS CO., INC., a corporation, Nebraska Natural Gas Co., a corporation,

Norton McMurray Manufacturing Company, a corporation, Appellee,

Louise T. Hammond.

Nos. 81–1488, 81–1283.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 15, 1981.

Decided Dec. 18, 1981.

Joseph P. Cashen, argued, Kennedy, Holland, Delacy & Svoboda, Omaha, Neb., for E. I. Du Pont de Nemours Co.

Lyle E. Strom, argued, Gerald L. Friedrichsen, Fitzgerald, Brown, Leahy, Strom, Schorr & Barmettler, Omaha, Neb., for Norton McMurray Mfg. Co.

Stephen A. Davis, argued, and Terry J. Grennan of Cassem, Tierney, Adams, Gotch & Douglas, Omaha, Neb., for appellant.

Before BRIGHT and ROSS, Circuit Judges, and LARSON,* Senior District Judge.

LARSON, Senior District Judge.

Bessie R. Strong, Administratrix of the Estate of Carl R. Strong, her deceased husband, brought actions sounding in negligence, strict liability, express warranty, and implied warranty in connection with the death of Mr. Strong. Mrs. Strong appeals from the district court's[1] denial of a new trial following a directed verdict for defendant Norton McMurray Manufacturing Company (Norton McMurray) and denial of a new trial following a jury verdict for defendant E. I. DuPont de Nemours Company (DuPont). We affirm.

I. *Facts*

On January 10, 1976, an explosion destroyed the Pathfinder Hotel at the intersection of Sixth and Broad Streets in downtown Fremont, Nebraska, and killed appellant's husband. Mr. Strong, a Construction Supervisor in the Fremont area for the Nebraska Natural Gas Company (NNG), was investigating a report of a gas odor in the hotel. A length of two-inch Adyl "A" plastic pipe, containing a metal insert stiffener, both manufactured by DuPont and sold to NNG, pulled from a connecting device called a compression coupling, manufactured by Norton McMurray and sold to

---

* The Honorable Earl R. Larson, United States Senior District Judge, District of Minnesota, sitting by designation.

1. The late Honorable Robert V. Denney, Judge of the United States District Court for the District of Nebraska.

NNG. The pull-out was caused by shrinkage in the plastic pipe due to cold, and the explosion occurred when gas migrated to the nearby hotel basement.

NNG began using plastic pipe as a substitute for metal pipe in 1972. The company connected lengths of DuPont plastic pipe to existing metal lines with compression couplings made by Norton McMurray and other manufacturers. Natural gas utilities, including NNG, have long used compression couplings to connect steel pipes to steel. A compression coupling is a metal cylinder, threaded on each end, and fitted with nuts. The ends of the pipes to be joined are inserted into the coupling, the nuts are tightened, and elastic tapered washers are thereby forced against the pipe creating a gas-tight seal. When compression couplings are used to join plastic pipes, metal stiffeners such as those manufactured by DuPont are inserted to keep the pipes from collapsing.

Plaintiff contends that DuPont and Norton McMurray failed accurately or adequately to warn NNG that a two-inch plastic pipe connected to a steel pipe by means of a compression coupling would not withstand longitudinal forces as the plastic pipe contracted and that "pull-out" would occur at the joint.[2] The risk of pull-out can be reduced by "anchoring" the pipe or by using "locking-type" compression couplings that are specially designed to withstand longitudinal forces.

Following the directions of Mr. Strong, NNG employees installed the plastic pipe and compression coupling at Sixth and Broad Streets in June of 1974. Mr. Strong personally inspected the connection before the workers buried it. Prior to the pull-out and explosion that killed him, Mr. Strong was aware of at least two other incidents involving pull-outs of plastic pipes from compression couplings. On November 29, 1974, Mr. Strong uncovered a pull-out at Sixth and C Streets in Fremont. Despite this incident, he conducted no tests or investigations to determine the safety of connecting two-inch plastic pipe with compres-

sion couplings. Also, on the night before the fatal explosion he was part of a crew that discovered a pull-out at Fifth and D Streets in Fremont.

Natural gas distribution systems are subject to both Federal and State regulation. NNG officials admitted at trial that their company is governed by the standards and regulations promulgated pursuant to the Natural Gas Pipeline Safety Act of 1968, Pub.L. 90–481, 82 Stat. 720 (1968), 49 U.S.C. §§ 1671 et seq. (1976). These standards require builders of natural gas pipelines to allow for thermal contraction and to install connections that will withstand pull-out. The regulations also require the preparation of a "procedure manual," and NNG complied with this regulation in June 1973. The NNG handbook stipulates that a locking-type compression coupling such as a "Posihold" or "lock stiffener" should have been used at Sixth and Broad Streets rather than the standard coupling that was employed. Employees who worked under plaintiff's decedent testified that they were unaware of both the regulations governing natural gas transportation and the NNG handbook.

A DuPont sales representative first introduced NNG to plastic pipe in 1972. In 1972, 1973, 1974, and 1975 DuPont sales representatives held training sessions for NNG employees and stated that plastic pipe could be connected with compression couplings. There is evidence that Mr. Strong attended a number of these sessions, that at least two of the sessions included the showing of DuPont films depicting the connection of plastic pipes with compression couplings, and that at least two sessions included demonstrations by the DuPont representatives of the procedures for making such connections. There was no mention of the pull-out problem at any of the sessions, although there was testimony at trial indicating that the representatives were aware of the hazard. The record also shows that a DuPont representative supervised the connection of the first plastic pipe in Fremont with a

2. There is no claim that the pipe, stiffener, or coupling were improperly manufactured.

Norton McMurray coupling and that another representative recommended plastic pipe as a safe replacement for downtown steel lines.

Over the years DuPont issued a variety of printed instructions and technical information to NNG. A number of these bulletins state that compression couplings can be used with plastic pipe, although Bulletin 680 captioned "Technical Data Sheet" notes the pull-out problem. NNG possessed this item prior to the installation of the coupling at Sixth and Broad. In 1975, prior to the pull-out at that intersection, DuPont issued revised bulletins to NNG warning of thermal contraction and of the need to anchor plastic pipes joined with compression couplings. The company also sent a newsletter to NNG in 1975 that discusses the need for anchoring, but none of the NNG employees who testified at trial said that they had read the newsletter.

The contacts between Norton McMurray and NNG were much less extensive than those between DuPont and NNG. There is conflicting evidence in the record on whether or not any Norton McMurray personnel actually knew that NNG used plastic pipe. The Norton McMurray catalog received by NNG did not include a warning of the potential pull-out problem along with its listing of the kind of compression coupling used at Sixth and Broad. The catalog did, however, list the availability of a locking-type compression coupling that was designed to resist pull-out, and in 1975 Norton McMurray provided NNG with a sample of this lock stiffener coupling. At no time did a Norton McMurray sales representative discuss the pull-out hazard with NNG. There is evidence in the record that Norton McMurray was aware of the problem, but that the company instructed its sales personnel not to discuss pull-out with customers unless they raised the topic.

The late Honorable Robert V. Denney, Judge of the United States District Court for the District of Nebraska, conducted a month long jury trial on plaintiff's claims. Judge Denney refused to allow an expert witness called by plaintiff to testify on the adequacy of the warnings and instructions in the DuPont films and printed materials and in the Norton McMurray catalog. Judge Denney granted Norton McMurray's motion for a directed verdict at the close of plaintiff's evidence and denied plaintiff's subsequent motion for a new trial. Judge Denney granted DuPont's motion to dismiss the causes of action based on express and implied warranty and refused to read plaintiff's proposed instruction on misrepresentation. The jury found for DuPont on the remaining claims of strict liability and negligence and the court denied plaintiff's motion for a new trial. In this appeal plaintiff argues that the court erred in excluding expert testimony, in granting Norton McMurray's motion for a directed verdict, in dismissing the express warranty claim against DuPont, and in refusing to read the instruction on misrepresentation.

II. *Expert Opinion Testimony*

Plaintiff called as her expert witness Robert F. Harrison, an engineer who has had experience investigating fires and explosions and who investigated the explosion in this case soon after it occurred. Defendants objected to a number of questions that plaintiff posed to Harrison, and the court sustained the objections. In offers of proof Harrison testified that in his opinion the various communications from DuPont and Norton McMurray to NNG did not provide adequate warnings and instructions. In particular, he stated that the lack of adequate warnings and instructions constituted defects which made the products unreasonably dangerous.

Under Fed.R.Evid. 704 an expert may render an opinion on an ultimate issue, but the testimony must be useful to the trier of fact. This is a matter within the broad discretion of the trial judge, and the trial court can only be overruled on appeal if there has been a clear abuse of discretion. *See Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962); *Moran v. Ford Motor Co.*, 476 F.2d 289, 291 (8th Cir. 1973). Having observed the progress of the trial, the trial

judge is usually in the best position to determine if opinion testimony will be helpful to the jury.

■ Following these standards and on the facts of this appeal, we cannot say that Judge Denney abused his discretion in excluding Harrison's opinions. At trial, Judge Denney provided a reasoned justification for his refusal to allow Harrison's testimony:

> My ruling was premised on the feeling that Harrison should not be allowed to invade the province of the jury. Of course, under Rule 704 of the Federal Rules of Evidence, testimony embracing an ultimate issue to be decided by the trier of fact is admissible under certain circumstances ... [but] ... the form of the question presented to Harrison was improper under Rule 704. With regard to forming a proper question, I suggest that you consult Paragraph 4 of the Advisory Committee Notes to Rule 704. In short, to ask a question on an ultimate issue like adequacy of warnings, the question must be phrased in terms of adequately explored legal criteria. It is my opinion that Mr. Davis' questions to Mr. Harrison were too broadly and simplistically phrased under Rule 704. A good example, under the Advisory Opinion, for example, under Rule 704—and this was the one I was thinking about—say a man named T—"did T have capacity to make a will?" would be excluded, while the question "Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?" would be allowed under Rule 704, but not just "Did he have the capacity to make a will?" and what the questions here were, "Is this an adequate warning?"—I don't think that was proper. Rule 704 did not abolish completely the old rule of the ultimate issue, but it laid down some guidelines where you could get it in ....

In addition to these considerations, we note that the question of whether the lack of warnings rendered the DuPont and Norton McMurray products unreasonably dangerous is not the kind of issue on which expert assistance is essential for the trier of fact. The jury was capable of drawing its own inferences from the available evidence. *See Arcement of Southern Pac. Transp. Co.*, 517 F.2d 729, 732 (5th Cir. 1975); *Krizak v. W. C. Brooks & Sons, Inc.*, 320 F.2d 37, 42 (4th Cir. 1963). Thus, Judge Denney did not err in excluding Harrison's testimony.

III. *Directed Verdict for Norton McMurray*

In considering a motion for a directed verdict, the trial judge must view all of the evidence in the light most favorable to the party opposing the motion. *Farner v. Paccar, Inc.*, 562 F.2d 518, 522 (8th Cir. 1977). If, in this light, reasonable people could differ in finding that the movant should prevail, then the court should not grant the motion. *Id.* Following these standards, we find that the directed verdict for Norton McMurray was appropriate.

■ Under the facts of this case the judge could find that Norton McMurray had no duty to warn NNG of the potential pull-out problem. In *Driekosen v. Black, Sivalls & Bryson, Inc.*, 158 Neb. 531, 547–48, 64 N.W.2d 88, 97 (1954), the Nebraska Supreme Court adopted the definition of negligent failure to warn found in Restatement of Torts § 388 (1934). This is essentially the same as the current version found in Restatement (Second) of Torts § 388 (1965):

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Subsection (b) of this test has been interpreted to mean that there is no duty to warn if the user knows or should know of the potential danger, especially when the user is a professional who should be aware of the characteristics of the product. *See Martinez v. Dixie Carriers, Inc.*, 529 F.2d 457, 464–65 (5th Cir. 1976); *Madrid v. Mine Safety Appliance Co.*, 486 F.2d 856, 860 (10th Cir. 1973); *Lockett v. General Electric Co.*, 376 F.Supp. 1201, 1208–09 (E.D.Pa. 1974), *aff'd*, 511 F.2d 1394 (3d Cir. 1975); *Bryant v. Hercules, Inc.*, 325 F.Supp. 241, 247 (W.D.Ky.1970). Other courts, including this one, have stated substantially the same position, although without explicit reference to the Restatement. *See Kerber v. American Mach. & Foundry Co.*, 411 F.2d 419 (8th Cir. 1969); *Thibodaux v. McWane Cast Iron Pipe Co.*, 381 F.2d 491, 495 (5th Cir. 1967); *Hopkins v. E. I. DuPont De Nemours & Co.*, 212 F.2d 623, 625 (3d Cir.), *cert. denied*, 348 U.S. 872, 75 S.Ct. 108, 99 L.Ed. 686 (1954); *Littlehale v. E. I. DuPont de Nemours & Co.*, 268 F.Supp. 791, 798 (S.D.N.Y.1966), *aff'd*, 380 F.2d 274 (2d Cir. 1967). *Thibodaux* was an action against a manufacturer of iron pipe. The pipe corroded and allowed natural gas to escape. The court held that the manufacturer was not under a duty to warn of the tendency of the pipe to corrode because the gas distribution system had been designed by an engineering firm and the engineers should have been aware of the potential hazard:

> This consulting engineering firm designed and supervised the entire natural gas system and sent a resident engineer to supervise the job. They prepared detailed specifications for the system including exact specifications for the cast iron pipe which they prescribed. It was the duty of the consulting engineers to select suitable materials for the gas system and to acquaint themselves with all scientific information regarding the work they were performing, such as the corrosion potential of the pipe in the soil of the City which they specifically requested for use in the gas system. We find that the consulting engineers were familiar with or chargeable with knowledge of the corrosion characteristics of McWane pipe and that such facts were properly within the scope of their own responsibility and expertise. We therefore conclude that McWane was under no obligation to inform them of such, or to give the warning as contended by the appellant.

381 F.2d at 495. In the realm of strict liability there is a similar principle providing that a manufacturer has no duty to warn when the dangers of a product are within the professional knowledge of the user. *Martinez v. Dixie Carriers, Inc.*, 529 F.2d at 465–67; *Madrid v. Mine Safety Appliance Co.*, 486 F.2d at 860.

■ Here, viewing the facts in the light most favorable to the plaintiff, Judge Denney could find that NNG and Mr. Strong knew or should have known of the pull-out hazard. In *Hammond v. Nebraska Natural Gas Co.*, 204 Neb. 80, 82–83, 281 N.W.2d 520, 522 (1979), an action arising out of the same explosion as the case at bar, the Nebraska Supreme Court found that the Nebraska Natural Gas Company was under a high duty of care with respect to the safety of its gas lines. Given this high duty of care, a manufacturer such as Norton McMurray could have assumed that NNG was aware of the pull-out problem. Indeed, the court in *Hammond* found that the danger was "well known throughout the industry." 204 Neb. at 86, 281 N.W.2d at 524. Moreover, NNG and plaintiff's decedent were aware of the hazard prior to January 1, 1976. We have already alluded to the two prior pull-outs investigated by Mr. Strong. We have also mentioned the applicable Federal regulations, the NNG handbook, and the various printed sources of information provided by DuPont. In light of these facts and the applicable legal standards, the trial court could properly have found that Norton McMurray was under no duty to warn NNG of the pull-out problem.

■ Even if Norton McMurray was under a duty to warn, its failure to do so could not have been the proximate cause of the accident because NNG and plaintiff's decedent were aware of the danger. If, despite deficient warnings by the manufacturer, a user is fully aware of the danger which a warning would alert him or her of, then the lack of warning is not the proximate cause of the injury. *Nelson v. Brunswick Corp.*, 503 F.2d 376, 379 (9th Cir. 1974); *Hammond v. Nebraska Natural Gas Co.*, 204 Neb. at 86, 281 N.W.2d at 524. In *Hammond* the Nebraska Supreme Court stated with respect to the liability of DuPont: "[a]ny negligence on the part of DuPont in failing to adequately instruct and warn the Gas Co. could not have been a proximate cause of the accident if the Gas Co. had actual knowledge of the matter." 204 Neb. at 86, 281 N.W.2d at 524. Similarly, failure to warn on the part of Norton McMurray in the case at bar could not have been the proximate cause of the injuries when NNG had actual knowledge of the hazards.

IV. *Dismissal of Express Warranty Claim Against DuPont*

■ Plaintiff maintains that there was a jury issue on whether DuPont expressly warranted that its pipe and stiffeners could be used safely with compression couplings in the manner NNG installed these products at Sixth and Broad Streets. Plaintiff points to the training films in which connections of this type were depicted, the representations made by DuPont sales personnel concerning this kind of connection, and the statements in various DuPont bulletins.

We seriously doubt that a reasonable jury could find under these facts that DuPont made an express warranty, especially when there was also evidence in the record that the company distributed other material that placed NNG on notice of the pull-out problem. The paucity of evidence on the existence of an express warranty was sufficient to support the trial court's refusal to give the express warranty issue to the jury.

■ Even if there was a potential issue of an express warranty, the plaintiff was not prejudiced under the facts of this case by the trial court's refusal to give the matter to the jury. Judge Denney indicated at trial that he believed that the plaintiff's theory of express warranty was essentially the same as her theories of negligence and strict liability. The instructions Judge Denney gave on negligence and strict liability placed the issue of the adequacy and accuracy of DuPont's warnings and instructions before the jury. *See Goblirsch v. Western Land Roller Co.*, 310 Minn. 471, 246 N.W.2d 687, 690 (1976) (failure to instruct on express warranty not prejudicial when covered by instruction on strict liability); *cf. Fisher v. Gate City Steel Corp.*, 190 Neb. 699, 703, 211 N.W.2d 914, 917 (1973) (failure to instruct on implied warranty not prejudicial when covered by instruction on strict liability) (dictum). In Instruction No. 23 on negligence the court instructed the jury to determine whether "THE DEFENDANT FAILED TO USE REASONABLE CARE TO GIVE ADEQUATE WARNINGS OR INSTRUCTIONS THAT WOULD HAVE PREVENTED THE PRODUCT FROM BEING UNREASONABLY DANGEROUS." In Instruction No. 14 on strict liability the court instructed the jury to determine whether the products "WERE IN A DEFECTIVE CONDITION BECAUSE THERE WAS A FAILURE TO ADEQUATELY WARN OF THE DANGERS OF THERMAL CONTRACTION PULL-OUT." In Instruction No. 15, also on strict liability, the court noted that "A MANUFACTURER OF GOODS HAS A DUTY TO GIVE A REASONABLE WARNING AS TO DANGERS INHERENT OR REASONABLY FORESEEABLE IN USING THE GOODS IN THE MANNER SPECIFIED." We recognize, of course, that there are instances where a failure to instruct on express warranty is prejudicial even though negligence and strict liability theories are given to the jury, but this is not such a case.

V. *Lack of Instruction on Misrepresentation*

■ A similar line of analysis leads us to the conclusion that plaintiff was not preju-

diced by the trial court's refusal to read her proposed Instruction No. 29 on misrepresentation. The essence of the instruction—whether the representations made by Du-Pont concerning its products were sufficiently accurate and adequate—was amply covered by the above quoted instructions on negligence and strict liability. As Prosser states, "misrepresentation frequently occurs in ordinary negligence actions for personal injuries or property damage, in the form of misleading words or acts, or non-disclosure of known facts, and the courts have not found it necessary to distinguish it in any way from any other negligence." W. Prosser, *Handbook of the Law of Torts* § 107, at 704 (4th ed. 1971). Prosser also states with regard to the tort of misrepresentation that "[t]he dispute over the proper form of action frequently has obscured the real question of whether the defendant should be held liable in the particular case. With the declining importance of the form and theory of the action under modern code pleading, it is the latter which is the really important problem, with which we must chiefly be concerned . . . ." *Id.*, § 105, at 687 (footnote omitted). Here, it was enough for the preservation of plaintiff's rights that the jury passed on the sufficiency of DuPont's communications under instructions from the court on negligence and strict liability. Finally, we note that there was no issue in this case of fraudulent misrepresentation. This was not pled, and it is distinguished from negligent misrepresentation under Nebraska law by the element of scienter. *See Ames Bank v. Hahn*, 205 Neb. 353, 355, 287 N.W.2d 687, 689 (1980).

Affirmed.