**Genon CROOK, Personal Representative of the Estate of Kenneth E. Crook, Deceased, Plaintiff,**

v.

**FARMLAND INDUSTRIES, INC., a Kansas corporation, Farmers Cooperative Business Association, a Nebraska corporation, Kaneb Pipe Line Operating Partnership, L.P., a Kansas partnership, Defendants.**

**No. 4:96CV3442.**

United States District Court, D. Nebraska.

July 12, 1999.

James M. Egr, Egr, Birkel Law Firm, David City, NE, Rodney J. Rehm, Lincoln, NE, Kelly M. Thomas, Svehla, Barrow Law Firm, York, NE, for Plaintiff.

Kevin Colleran, Gregory S. Heier, Cline, Williams Law Firm, Lincoln, NE, Tracy A. Oldemeyer, Cline, Williams Law Firm, Omaha, NE, Randall L. Goyette, Baylor, Evnen Law Firm, Gregory D. Barton, Robert L. Bals, Karen A. Haase, Harding, Shultz Law Firm, Lincoln, NE, Terence A. O'Keefe, Reed Rasmussen, Siegel, Barnett Law Firm, Aberdeen, SD, for Defendants.

## MEMORANDUM AND ORDER

KOPF, District Judge.

Kenneth E. Crook was employed at the Farmers Cooperative Business Association (Coop) as a branch manager. He was killed when propane leaked from piping at the Coop and exploded. His estate sued the pipeline that transported the gas to the Coop's trucks—Kaneb Pipe Line Operat-

ing Partnership, L.P. (Kaneb)—and the seller of the gas—Farmland Industries, Inc. (Farmland).[1] The case was removed to this court by the defendants based upon diversity of citizenship.

After the issues were narrowed, the plaintiff claimed that the defendants failed to give sufficient warning that leaking propane may not be noticeable by smell because the odorant injected into the propane may fade and therefore gas detectors should be used. After discovery, the defendants moved for summary judgment. Following extensive briefing and oral argument, I now grant the motions for summary judgment.

## I.  FACTUAL BACKGROUND

The material facts are undisputed. We describe those facts in the following portions of this opinion.

### A.  The Parties

#### 1.  The Seller: Farmland

Farmland is a corporation organized and existing under the laws of the State of Kansas. It is engaged in a variety of business activities, among which is the sale of liquefied petroleum gas products within the State of Nebraska. (Amended Complaint, ¶ 3; Amended Answer of Farmland, ¶ 2.) Among Farmland's customers was the Coop, which purchased propane gas from Farmland at various times. (Amended Complaint, ¶ 8; Amended Answer of Farmland, ¶ 3.) On or about October 8, 1994, Farmland sold two separate loads of propane gas to the Coop. (Amended Complaint, ¶ 8.)

In 1994, the Coop twice made safety representations to Farmland regarding gas. In particular, the Coop represented that it was "familiar with properties of NGL gas products and safe methods of handling them." (Affidavit of Pamela A.

---

**1.** The Coop was named a party as required by Nebraska law to protect its subrogation inter-

ests.

Williams ("P. Williams Aff."), ¶ 6 and Ex. 18, ¶ 12.) Moreover, the Coop promised to "inform the [Coop's] customers of the same." (*Id.*)

Farmland contracts with various shippers, including Kaneb, to transport its petroleum products. (Affidavit of LeRoy Anderson ("L. Anderson Aff."), ¶ 2 and Ex. A.) Under the terms of the pipeline tariff governing Kaneb's relationship with Farmland, Farmland is obligated to indemnify and defend Kaneb from any claims "for personal injury, death, or property damage involving Carrier, Shipper, Shipper's Consignee, or third parties based on or arising out of selection or use of ethyl mercaptan as an odorant or arising from Shipper or Shipper's Consignee's delivery, receipt, use, transportation, storage, or sale of odorized and unodorized propane." (Answer and Cross–Claim of Kaneb Pipe Line Operating Partnership, L.P., ¶ 22, Cross–Claim, ¶ 6 and Ex. A.)

### 2. The Shipper: Kaneb

Kaneb is a common carrier acting pursuant to a tariff filed with the Federal Energy Regulatory Commission. (L. Anderson Aff., ¶¶ 2, 3.) Kaneb operates a pipeline that transports petroleum products such as gas and fuel oils and liquefied petroleum products commonly known as propane. (L. Anderson Aff., ¶ 3.) Shippers like Farmland, who need to move petroleum products, contract with Kaneb to transport products through the Kaneb pipeline and store them before sale. After Farmland has entered into a contract with a buyer, Farmland directs Kaneb to release an amount of propane to that purchaser. At no time during this process does Kaneb own, manufacture or sell the products it transports or stores. (L. Anderson Aff., ¶ 3 and Ex. A.) In 1994, Kaneb operated six terminals in the State of Nebraska, including one in Geneva, Nebraska. The Geneva terminal operated 24 hours a day, seven days per week. (L. Anderson Aff., ¶ 4.) Kaneb charged shippers, including

Farmland, for transportation, storage, and terminal services. (L. Anderson Aff., ¶ 8.)

Propane gas has many uses as a fuel used to run vehicles and appliances such as stoves, water heaters and furnaces. Liquid propane is stored under pressure in a tank or cylinder. In most systems, the propane is changed or vaporized from a liquid to a gas before it leaves the tank or cylinder and passes through the regulator. Despite its utility, propane gas, like any combustible fuel, is a dangerous product. Propane gas is odorless, colorless and highly flammable. Because of these characteristics, propane is hardly ever sold to consumers in its natural state. 49 C.F.R. § 173.315(b)(1). Instead, they mix propane with a chemical odorant, that gives propane a distinctive smell and warns of its presence. The odorant most commonly added to propane gas is the chemical ethyl mercaptan. (Affidavit of Jacqueline Huelskamp ("J. Huelskamp Aff."), ¶ 6 and Ex. E.) ("Technical Information Bulletin: TB34.19–1," ¶ I.C.)

As a shipper of liquid propane, state fire code required Kaneb to place odorant into propane as it left the storage facilities. (L. Anderson Aff., ¶ 7 and Exs. B, C; Affidavit of Douglas Hohbein ("D. Hohbein Aff."), ¶¶ 2–4 and Exs. A–D.) Kaneb contacted Farmland and asked if Farmland wanted any specific odorant injected into the liquid propane. (L. Anderson Aff., ¶ 8; Affidavit of Leon Hutchins ("L. Hutchins Aff."), ¶ 2 and Ex. A.) In this request, Kaneb offered to acquire and inject ethyl mercaptan unless Farmland preferred another odorant. (L. Anderson Aff., ¶ 7.) Ethyl mercaptan was used as an odorant because it was generally recognized as an appropriate odorant in the propane industry. (J. Huelskamp Aff., ¶ 6 and Ex. E.) ("Technical Information Bulletin: TB34.19–1," ¶ I.C.) Ninety-five percent of propane sellers and shippers use ethyl mercaptan as an odorant. (J. Huelskamp Aff., ¶ 6 and Ex. E.) ("Technical Information Bulletin: TB34.19–1," ¶ I.C.) Kaneb charged its customers for the ethyl mercaptan at a rate

that was designed to recover only the costs of the ethyl mercaptan, and the cost of purchasing, operating, and maintaining the odorant injection system. Kaneb does not recoup any profit from the resale or injection of ethyl mercaptan. (L. Anderson Aff., ¶ 8.)

When a driver arrived at one of Kaneb's facilities, he or she initiated the loading operation. (L. Anderson Aff., ¶ 8.) They automatically injected the ethyl mercaptan into the propane at the loading island just before the propane entered the transport vehicle. (L. Anderson Aff., ¶ 8.) They calibrated the equipment to inject the ethyl mercaptan at a rate that exceeds 1.5 pounds of ethyl mercaptan per 10,000 gallons of propane, more than the minimum of 1.0 pounds per 10,000 gallons recognized in the Appendix to NFPA No. 58 as generally acceptable. (L. Anderson Aff., ¶ 8; J. Huelskamp Aff., ¶ 6 and Ex. E.) ("Technical Information Bulletin: TB34.19–1," ¶ I.C.)

Kaneb is not in the business of providing consulting services to shippers or customers of shippers regarding the physical layout of their facilities or business operations carried out by them and Kaneb has never been asked to provide such services to the Coop at any of its facilities, including the facility in Gresham, Nebraska. (L. Anderson Aff., ¶ 6.)

### 3. The Purchaser and The Manager: Farmer's Cooperative Business Association and Kenneth Crook

In October of 1994, there were five Coop employees assigned to the Coop's Gresham facility: Dan Noble, Tim Noble, Jeff Prigge, Kurt Rhodes and Kenneth Crook. (D. Noble Depo., pp. 47:24–48:3.) Crook had worked at the Coop for twenty-eight years. (See Amended Complaint, ¶ 22 and Amended Answer, ¶ 15.) Crook had been the branch manager of the Coop's Rising City facility since 1975 and the branch manager of the Coop's Gresham facility since 1987. (Ex. 9, Answer 1(a).) As the Gresham branch manager, Crook was responsible for training the Coop's employees. (Ex. 10.) His job description states:

> Develops a training program for personnel directly supervised to ensure that they are thoroughly trained in accordance with the qualifications and requirements of their positions.

(Ex. 10 at 2.) Crook directly supervised the "Propane and Grain Serviceman." (Ex. 10 at 1.)

The Coop's Gresham facility has a long history, since at least 1977, of handling propane gas. (D. Noble Depo., p. 9:5–10.) The Coop has maintained two 18,000–gallon propane gas storage tanks at the Coop's Gresham facility since the 1960's. (D. Noble Depo., p. 13:2–10.) The Coop also maintains four propane gas delivery trucks at its Gresham facility, three of which have a capacity of 3,000 gallons, with the remaining truck having a capacity of 3,200 gallons. (D. Noble Depo., pp. 12:11–21; 14:3–15.) The Coop's Gresham facility has transported propane with its own trucks since 1976. (D. Noble Depo., pp. 11:14–12:21.)

The Coop both "consumes propane gas at the Gresham facility, [and] more importantly it sells propane gas to customers." (J. Gabriel Depo., p. 21:9–13.) The Coop maintains bulk delivery trucks at the Gresham facility, for delivery of large amounts of propane to customers. The Coop also fills and delivers to customers propane bottles in 20, 30, 40 and 100–pound quantities. (T. Noble Depo., pp. 9:5–17; 10:10–15.) Bulk deliveries of propane gas from the Coop's Gresham facility have historically been for "residential use, farm use [and] industrial use" customers. (T. Noble Depo., p. 10:10–15.)

The transport trucks of the Coop were used to pick up the propane in Geneva and take it to the Gresham facility. (D. Noble Depo., p. 49:7–12.) They would then pump it from the transport truck into the 18,000–gallon tanks at the Coop. (D. Noble Depo., p. 49:19–23.) From the 18,000–gallon tanks, they would put it into Mr. Noble's

delivery truck. (D. Noble Depo., pp. 49:24–50:1.) From the delivery truck, Mr. Noble took the propane to the two 300–gallon underground tanks that were used to operate the Coop's grain dryer. (D. Noble Depo., p. 50:2–51:5.)

The propane gas was purchased from Farmland by the Coop for resale to retail customers. The propane was also used to provide fuel for a grain dryer at the Coop's grain elevator in Gresham, Nebraska. (Amended Complaint, ¶ 8; Amended Answer of Farmland, ¶ 3.) A high pressure, underground propane line ran from the storage tanks to the grain dryer. (D. Noble Depo., pp. 59:13–61:6.) That line ran approximately 300 feet in distance and came out of the ground approximately 50 feet before it reached the grain dryer. (D. Noble Depo., p. 51:7–16.) The Coop decided to have, and paid for having this line installed in the late 1980's by a local plumbing and heating contractor from Shelby, Nebraska. (D. Noble Depo., pp. 61:17–62:7.) The line was pressure-tested each year through 1993 by Coop personnel. (D. Noble Depo., pp. 79:15–81:17.) In the year 1994, inexplicably, the Coop did not pressure test its line before the time the October 11, 1994–explosion occurred. (D. Noble Depo., pp. 79:15–81:21.)

The employee of the Coop's Gresham facility who has continuously had responsibility for the hauling and handling of propane gas for the last 22 years is an individual by the name of Dan Noble. (D. Noble Depo., p. 9:5–10; K. Rhodes Depo., p. 12:11–20.) When Dan Noble was first hired by the Coop in 1976, they gave him instructions about the characteristics of propane. As of 1976, Dan Noble knew that propane "was a pressurized gas and that propane itself in its pure form has no smell, and they add mercaptan to it to give it that smell so that you are aware of it," and he received "other instructions on filling tanks and how to do it." (D. Noble Depo., pp. 14:16–15:4.) In short, as of 1976, the Coop, through the knowledge of Dan Noble, knew that propane was odor-less, colorless, heavier than air, which "means that it will go to the lowest point in any certain area," and that propane was dangerous "if not handled properly." (D. Noble Depo., p. 15:5–22.)

In the more than 21 years that Dan Noble has been working at the Coop's Gresham facility, the propane delivered to the Coop has always been injected with the odorant ethyl mercaptan, which is "effective in alerting an individual ... to the presence of propane." (D. Noble Depo., pp. 16:15–17:3.) By June of 1977, Dan Noble, and thereby the Coop, was also aware of the limitations of ethyl mercaptan, including the fact that this odorant could filter out or lose its effectiveness when going through soil. (D. Noble Depo., pp. 18:5–19:9.)

In fact, Dan Noble has provided instruction to the Coop's customers regarding the characteristics of propane and ethyl mercaptan, including that the propane is "heavier than air," and "it's a possibility that if it leaks through the soil that it might not be noticeable by smell." (D. Noble Depo., p. 22:7–19.) Dan Noble is competent to provide such instruction to the Coop's customers because, besides his years of on-the-job experience with propane handling, he has also attended many safety seminars since 1977, at which they addressed the subject of the "odor fade" limitation of ethyl mercaptan. (D. Noble Depo., pp. 19:23–21:17.) Indeed, Dan Noble was certified before October of 1994 by the National Propane Gas Association, as an individual who "has had specialized training in the installation of propane piping," and he has provided the Coop's customers with instruction on that subject matter as well. (D. Noble Depo., pp. 26:2–28:4; 28:16–30:10.)

Kurt Rhodes, a Coop employee, acknowledged signing for mailings sent by Kaneb and placing them on the desk of Mr. Crook. (K. Rhodes Depo., pp. 52:11–56:12.) Jacqueline Huelskamp confirms in her affidavit that the mailings he signed

for included safety and warning literature. (J. Huelskamp Aff., ¶ 3–6 and Exs. A,C,E.)

Significantly, before October 1994, Dan Noble, who received training at many seminars on the subject, discussed the characteristics of ethyl mercaptan with Mr. Crook, including odorant fade. (D. Noble Depo., pp. 161:25–162:18; 178:5–21.) When Dan Noble took "CTEP" training, he had packets to complete with Kenneth Crook. (D. Noble Depo., pp. 161:25–162:18; 163:24–164:17; 175:11–20.) Odor fade was a part of the testing. (D. Noble Depo., pp. 161:25–162:18; 163:24–164:17.)

Noble described his discussions with Crook this way:

Q. Did you ever have any discussions with Mr. Crook regarding ethyl mercaptan, its characteristics and the concepts of odorant fade?

A. Yeah, we had talked about that, I'm sure, at some point or another. When I took the CTEP training, we had to—I had certain—different packets that I had to complete with him doing the testing, and I know that was part of that testing and I know that we had talked to—or talked about that at some point or another. It just come up in discussions I guess. I couldn't say exactly when, but I'm positive that we had talked about that.

Q. This would have included a discussion of the characteristics of ethyl mercaptan and the odorant fade—

A. Yes.

Q. —characteristics?

A. Yes.

(D. Noble Depo., pp. 161:25–162:18.)

. . . . .

Q. Now, I think you said—now, I understood you to say that you discussed the concepts of ethyl mercaptan and odorant fading in your communication with him.

A. Yes.

Q. Was that because of the testing specifically or how did that come up?

A. Again, that was part of the test. It's part of the characteristics of propane and why it was added and that kind of thing. But, again, I think at some point just in conversation that we had talked about it. You know, I couldn't give you specifics as of when, but, you know, just him being around—being around it because that's what I did, you know, he was made aware of why it smelled like it smelled and that kind of thing.

(D. Noble Depo., pp. 163:24–164:14.)

. . . . .

Q. Your previous testimony was that you think you probably did discuss it with him?

A. Yes.

Q. And it's just because you were doing the training for CTEP?

A. Yes.

Q. And it's just your—you think you discussed it with him because it would have been in the natural course of your conversations?

A. At some point, yes.

(D. Noble Depo., p. 175:15–24.)

. . . . .

Q. As I understand it, you don't know exactly what day you had the discussion; is that right?

A. Right.

Q. But you're confident that you did have discussion of that subject matter?

A. Yes.

(D. Noble Depo., p. 178:15–21.)

Further, the Coop has been well aware for many years of methods and devices that are available to test for propane gas leaks. In fact, in the past, the Coop "used electronic leak detectors." (D. Noble Depo., p. 33:6–19.) However, the Coop stopped using "electronic leak detectors" before October of 1994 because the Coop considered electronic detectors to be "too expensive." (D. Noble Depo., pp. 33:20–34:9.)

## B. The Incident

On October 11, 1994, an employee of the Coop partially filled the two 1,000–gallon propane storage tanks used to supply liquid propane to the grain dryer unit at the Gresham, Nebraska facility. The storage tanks were empty at the time of the delivery of the propane gas. (Amended Complaint, ¶ 10.) At some point before 2:00 p.m. on October 11, 1994, the underground pipeline connecting the storage tanks to the grain dryer apparently leaked propane gas out of the system. (Amended Complaint, ¶ 11.) There was a basement under the main floor of the office building of the Coop. (D. Noble Depo., pp. 93:8–95:2.) This basement contained the electric water heater, the motor, and oil tank for the probe that is used to obtain grain samples for testing at the time of delivery. (D. Noble Depo., pp. 94:8–95:2.) After the pipeline began leaking, propane gas apparently collected in the basement area of the Coop's office building. (Amended Complaint, ¶ 11.) None of the employees or customers in the office building detected the odor of ethyl mercaptan. (Amended Complaint, ¶ 11.)

At approximately 2:00 p.m. on October 11, 1994, a spark ignited the liquid propane that had leaked into the basement of the business office. Because of the explosion, Mr. Crook suffered serious injuries and ultimately died. (Amended Complaint, ¶ 15.) Investigation after the explosion established that the leak had occurred around the threads in an underground pipe coupler, which was used to connect two 1,000–gallon propane tanks to the Coop's grain dryer. (D. Noble Depo., pp. 69:11–70:16; 85:2–86:3; 87:1–4 and Ex. 1.)

## C. The Warnings Provided

Although Kaneb claims that it is under no legal obligation to do so, Kaneb routinely distributed warning literature to shippers, customers of shippers, and carriers involved in the transportation of propane from terminals operated by Kaneb. (J. Huelskamp Aff., ¶ 2.) They annually mailed packets of warning literature to the Coop in Gresham, Nebraska. (J. Huelskamp Aff., ¶ 3.) Kaneb mailed packets of warning literature to the Coop, in 1991, 1992 and 1993. (J. Huelskamp Aff., ¶¶ 3–6 and Exs. A,C,E.) The Coop unquestionably received each of these warning packets. (J. Huelskamp Aff., ¶¶ 3–6 and Exs. B,D,F.) They also sent a copy of this warning literature to Farmland. (J. Huelskamp Aff., ¶ 7.)

Kaneb's 1993 packet of literature, which was sent to and received by the Coop, contained extensive warnings. Kaneb's packet warned repeatedly about the risks associated with the use and handling of propane gas:

- Propane gas is **EXTREMELY FLAMMABLE.**
- Propane vapors may ignite **EXPLOSIVELY.**
- YOU MAY HAVE A LEGAL DUTY TO WARN EMPLOYEES, CUSTOMERS, AND OTHERS USING OR HANDLING ODORIZED PROPANE OF THE INFORMATION IN THIS BULLETIN.
- Propane is a flammable gas and when handled improperly, can cause explosion and fire.
- **Propane vapors may cause suffocation, flash fires, and explosions if gathered in high enough concentrations.**
- Propane in a flammable mixture of air (oxygen) can be ignited by many different ignition sources. These include, but are not limited to, open flames, smoking materials, electrical switches, pilot lights, sparks caused by friction, etc.
- LP–Gas in its processed state is virtually odorless, therefore, odorant is added to warn of the presence of LP–Gas. Detection of LP–Gas in the atmosphere is important because it is a flammable gas which can cause fires and/or explosions when improperly handled.
- WARNING: THERE IS NO SINGLE ODORANT, OR ODORANT

BLEND, KNOWN WHICH GIVES AN EFFECTIVE WARNING OF THE PRESENCE OF A PROPANE GAS LEAK IN EVERY POSSIBLE CIRCUMSTANCE TO EVERY SINGLE INDIVIDUAL WHO MIGHT BE PUT IN DANGER BY A LEAK. WHENEVER PROPANE IS USED, THE ABSENCE OF A STRONG AND DISAGREEABLE ODOR, OR ANY ODOR, SHOULD NOT BE TAKEN TO MEAN THERE IS NO DANGER. COMMON SENSE ON THE PART OF LP–GAS USERS, COUPLED WITH EDUCATION OF THE USERS BY THEIR RETAIL MARKETERS, IS NEEDED TO LESSEN THE RISK OF DEATH OR A VERY SERIOUS INJURY CAUSED BY A PROPANE FLASH–FIRE OR EXPLOSION. PROPANE IS FLAMMABLE, AND MUST BE USED WITH A GOOD DEAL OF RESPECT.

(J. Huelskamp Aff., ¶ 6 and Ex. E.) (all emphasis and capitalization in original).

Additionally, Kaneb's packet of warning literature emphasized the danger of "odor fade":

● Under certain circumstances, propane gas may lose the distinctive odor that was added. This is sometimes called *'odor fade'* . . .

● Propane gas leaking from buried gas lines may lose its odor as it passes through the ground, depending on the type of soil and the distance the gas travels. . . . *Leaking gas from buried lines may lose its odor as it passes through the soil.*

● Ethyl mercaptan odorant in LP–Gas can fade. . . . Soil will also absorb mercaptan molecules.

● Odorants do, however, have certain limitations. Under certain circumstances not everyone can smell ethyl mercaptan. Some people simply cannot smell certain odors including ethyl mercaptan. Certain physical conditions such as competing odors, common colds and allergies, smoking, eating, etc., may lessen a person's ability to smell ethyl mercaptan. Additionally, high concentrations of ethyl mercaptan may shock, or essentially paralyze, a person's sense of smell. This condition may reduce one's ability to smell the odor of ethyl mercaptan and thus detect the presence of propane vapor.

● Some odorants, such as ethyl mercaptan, that are mixed into propane can adsorb under certain circumstances, which diminishes their detectability by smell. For example, if there is an underground leak, the movement of the gas through the soil can cause the odorant to adsorb and, thus, diminish its distinctive smell.

● WARNING: Be aware that with odorized product the intensity of ethyl mercaptan stench (its odor) may fade due to chemical oxidation (in the presence of rust, air, or moisture), adsorption or absorption. Some people have nasal perception problems and may not be able to smell the ethyl mercaptan stench. Other odors may mask or hide the ethyl mercaptan stench. While ethyl mercaptan may not impart the warning of the presence of propane in every instance, it is generally effective in a majority of situations. Familiarize yourself, and your customers, with this warning, and other facts associated with the so-called "odor-fade phenomenon."

● Ethyl mercaptan is the predominant odorant of choice (95%) in the propane industry. Ethyl mercaptan is used to odorize LP–Gas because of its overall effectiveness as a warning agent. 1.0 pound of ethyl mercaptan per 10,000 gallons of liquid LP–Gas is thought to produce an effectively odorized gas; however, the normal industry practice is to add 1.5 pounds, and as much as 2.5 pounds can be used. Warning: all marketers should be aware of the circumstances which may reduce the effectiveness of ethyl mercaptan as an odorant and so inform their customers.

• The amount of ethyl mercaptan odorant in LP–Gas can diminish (causing an "odor fade") because of ... [s]elective adsorption (filtering) of the odorant molecules by soils in the case of underground piping leaks.

• Under some of the following conditions, you may not smell a gas leak: ... odor fade ...

• **Odor Fade** Under rare conditions, the chemical odorant (usually ethyl mercaptan) that gives propane a distinctive smell can "fade" or diminish in intensity.

• Odor fade can occur when there is an underground propane leak. The movement of gas through the soil can filter out the odorant.

• *KNOW THESE IMPORTANT POINTS ... A leak can exist even if there is no smell of gas.* The odorant added to propane can be an effective warning device in the event of a leak. However, the odorant can fade if it has been oxidized, adsorbed (sticks to surfaces), or absorbed. Competing odors and a person's inability to smell can also mask or cover up propane odor.

(J. Huelskamp Aff., ¶ 6 and Ex. E) (all emphasis and capitalization in original).

Kaneb's literature also warned that leaking propane gas often collects in low areas, such as basements:

• Highly flammable vapors which are heavier than air may accumulate in low areas and/or spread along ground away from handling site.

• Even though the stench of an odorant will rapidly spread throughout a room, a person should be made aware that the strongest odor may be near the floor where LP–Gas may tend to concentrate. This is particularly important when gas is released in basements or other confined areas where there is little air movement.

• When a leak occurs, propane gas will tend to collect initially at low levels, but with time it will diffuse and spread.

The propane at floor level may have a stronger odor than at face level.

• **WARNING Propane gas is heavier than air and may collect initially at low levels.**

• **Below-grade installation** Propane does not dissipate as rapidly as natural gas. Although propane will diffuse and spread with time, it tends to collect initially in low areas (including basements). Good ventilation is required to remove propane from a basement or any below-grade location.

(J. Huelskamp Aff., ¶ 6 and Ex. E) (all emphasis and capitalization in original).

Kaneb's warning literature also advised the Coop that it should consider installing electronic gas detectors:

• If your sense of smell is impaired, consider installing an electronic gas detector.

• LP-gas customers should also be made aware that some people, for various reasons, may not smell gas odorant as well as others. Underwriters laboratory approved electronic hydrocarbon detectors designed for the detection of LP-gas in the home are now being marketed by several vendors. Such equipment may provide the LP-gas user an extra measure of safety. Kaneb has not tested these devices and, for that reason, does not recommend or endorse any model or brand. This is something, however, for you to check into.

• **WARNING Gas detectors should be located near ground level to increase the likelihood of detection of escaping propane.**

• **NOTE:** As an added precaution, avoid relying solely on your sense of smell by installing electronic gas detectors.

• **Electronic gas detectors** ... Gas detectors, listed by the Underwriter Laboratories (UL) and others, can be used as an extra measure of safety for detecting leaks. Detectors that emit a loud, shrill horn sound are now on the market at a reasonable price.

• **Installing gas detectors** Install gas detectors near the floor in each room where a propane appliance is operating. . . . Carefully follow the manufacturer's instructions when installing gas detectors. Your local propane dealer can assist you in obtaining and installing gas detectors.

• If you have propane-fueled appliances installed below grade, make sure you also have a positive air flow ventilation system or an electronic gas detector listed by UL or others.

• Your propane dealer can refuse, for your safety, to continue to supply you with gas until you have installed an adequate cross-ventilation system or gas detector.

• Gas detectors may provide an extra measure of safety in case of a gas leak.

(J. Huelskamp Aff., ¶ 6 and Ex. E) (all emphasis and capitalization in original).

Kaneb's warning literature included "Safety and Warning Information Booklet for Propane Users," a glossy red and black booklet which featured multiple typefaces and boxed warnings, pictures and diagrams, a pull-out poster and a checklist of customer questions. Other items in the packet included a Material Safety Data Sheet; a Technical Information Bulletin; a flier titled "LP–Gas Odorization Information" printed on yellow paper and featuring the word "WARNING" in prominent type near pictographs of fires and explosions; and an illustrated blue and white folded pamphlet entitled "How's your nose . . . ." (J. Huelskamp Aff., ¶ 6 and Ex. E.)

Kurt Rhodes, a long-time employee of the Coop, signed the certified mail receipts for the Coop, acknowledging receipt of Kaneb's mailings in 1992 and 1993 and Mr. Rhodes personally placed the packets he signed for on the desk of Kenneth Crook. (K. Rhodes Depo., pp. 52:11–56:16.) Mr. Crook was the manager of the Gresham, Nebraska, facility. (J. Gabriel Depo., 5:10–8:16.) It was the usual and customary practice for Mr. Crook to immediately open mail placed on his desk, himself, as he did not have a personal secretary. (K. Rhodes Depo., 53:23–54:5; 56:3–12.)

Besides these extensive warnings contained in Kaneb's annual packets, a bill of lading accompanied every truckload of liquid propane gas obtained by the Coop from the Kaneb terminal that included the following warning:

**WARNING: PROPANE LEAVING KANEB TERMINALS IS ODORIZED WITH ETHYL MERCAPTAN UNLESS OTHERWISE SPECIFIED. THERE IS NO SINGLE ODORANT, OR ODORANT BLEND, KNOWN WHICH GIVES EFFECTIVE WARNING OF THE PRESENCE OF A PROPANE GAS LEAK IN EVERY POSSIBLE CIRCUMSTANCE TO EVERY SINGLE INDIVIDUAL WHO MIGHT BE PUT IN DANGER BY A LEAK. WHENEVER PROPANE IS USED, THE ABSENCE OF A STRONG AND DISAGREEABLE ODOR, OR ANY ODOR SHOULD NOT BE TAKEN TO MEAN THERE IS NO DANGER. PROPANE IS HEAVIER THAN AIR AND THUS MAY ACCUMULATE IN LOW AREAS OR BASEMENTS IN THE EVENT OF A LEAK. PROPANE IS ALSO FLAMMABLE AND IF A LEAK IS EVEN SLIGHTLY SUSPECTED, ACT QUICKLY TO EVACUATE ALL PERSONS IN THE AREA AND CALL FOR A TRAINED PROFESSIONAL LP–GAS MARKETER TO ASSIST IN EVALUATING THE SITUATION.**

(L. Anderson Aff., ¶ 9 and Exs. D,E,F) (emphasis and capitalization original).

## II. DISCUSSION

The plaintiff's claim against Kaneb and Farmland is based upon on a negligence theory and a strict liability theory. After the plaintiff abandoned all others, the plaintiff now rests upon the following argument:

Kaneb and Farmland failed to sufficiently warn the Coop and the plaintiff's decedent about the dangers of odorant fade and the need for gas detectors. Therefore, they are responsible to the plaintiff under Nebraska negligence and strict liability law.

Kaneb and Farmland respond by arguing that they had no responsibility to warn because the Coop and Crook were knowledgeable professionals in the field. Moreover, both had actual knowledge of the dangers of propane, including odorant fade. Thus, the defendants cannot be liable under a negligence theory or a strict liability theory for failure to warn. They also argue that they are not "manufacturers" as that term is understood under Nebraska law and thus Nebraska's strict liability law does not apply to them. In addition, they argue that the warnings that were undisputably given were sufficient.

■ I agree with the defendants that no warnings were required because the Coop and the plaintiff's decedent were knowledgeable purchasers or users. Accordingly, the motions for summary judgment will be granted.[2]

## A. Nebraska Strict Liability and Negligence Principles are the Same Regarding the Responsibility (Duty) to Give Warnings.

Although the theories of negligence and strict liability are different in many respects, a failure to warn case brought under both theories always presents an identical question under Nebraska law. The question is: under the particular circumstances of the pending case, does the law hold the defendant responsible for giving a warning? *Strong v. E.I. DuPont de Nemours Co., Inc.*, 667 F.2d 682, 687 (8th Cir. 1981) (equating negligence and strict liabil-

ity principles under Nebraska law in a failure-to-warn case involving a gas explosion where a coupling "pulled out" allowing gas to leak; sustaining directed verdict on warning claim); W. Page Keeton et al., *Prosser and Keeton on Torts*, § 99 at 697 (5th ed.1984) (discussing meaning of "dangerously defective" in the context of "strict liability"; addressing the "failure to warn" aspect of strict liability; stating: "[N]otwithstanding what a few courts have said, a claimant who seeks recovery on this basis must, according to the generally accepted view, prove the manufacturer-designer was negligent"; adding that: "Although this ground of recovery [failure to warn] is sometimes referred to as strict liability, it is really nothing more than a ground of negligence liability described as the sale of a product in a defective condition....") *See also Nebraska Jury Instructions (Second)* 11.23 at 11.23–2 (1998) (product liability; insufficient warning) (comment) (particularly referring the reader to W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 99 (5th ed.1984)).

## B. Whether Viewed From the Perspective of a Responsibility (Duty) to Warn or From the Perspective of Proximate Cause, the Defendants Have No Liability under Nebraska Law If the Coop and Crook Knew or Should Have Known of the Dangerous Condition of the Product and the Methods that Were Available to Protect Themselves.

With the understanding that Nebraska negligence and strict liability law are similar on this point, we ask: is a defendant required to give a warning about the dangerous condition of a product when the defendant has reasonable cause to believe that the purchaser, and the purchaser's manager, know or should know of that

---

**2.** As to whether the defendants are "manufacturers" under Nebraska's strict liability law, that issue is one of first impression. Since I can grant the motions for summary judgment without reaching that question of first impression, respect for the development of Nebraska

law by the Nebraska courts dictates that I avoid the issue. As to Kaneb's argument that the warnings it gave were sufficient, it is also unnecessary to reach that claim. Since those warnings may be at issue in other cases, I think it wise to avoid that question as well.

danger already? Under Nebraska law, the answer to that question is clearly "no."

■ A supplier of a dangerous product has no responsibility (duty) to warn a knowledgeable user of the dangers of the product if the supplier reasonably believes that the user knows or should know about the danger without a warning. *Restatement (Second) of Torts* § 388 & comment k (1965)[3] (a supplier of a dangerous product must provide a warning if it *"has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition"*; a responsibility to warn exists *"if, but only if, he has no reason to expect that those for whose use the chattel is supplied will discover its condition and realize the danger involved."*). (Emphasis added.) *Accord Strong,* 667 F.2d at 687–688 (applying Nebraska law; stating that under Nebraska law one who supplies directly or through a third person a chattel for another to use *"has no duty to warn if the user knows or should know of the potential danger, especially when the user is a professional who should be aware of the characteristics of the product"*; holding that where gas company and its employee, a supervisor, knew of the hazard, the manufacturer of a coupling had no duty to warn of "pull out" danger; district court properly directed a verdict against estate of an employee of gas company who was killed in an explosion while investigating a suspected leak)

(emphasis added); *Erickson v. Monarch Indus.,* 216 Neb. 875, 886, 347 N.W.2d 99, 108 (1984) (product liability and negligence theories based in part upon failure to warn; relying upon section 388; stating that " *'warning of a product's defects is unnecessary where the supplier of the product has reason to believe that those who will use it will have such special experience as will enable them to perceive the danger.'* ") (emphasis added) (quoting *Martinez v. Dixie Carriers, Inc.,* 529 F.2d 457, 465 (5th Cir.1976)).

■ We can also understand this principle in terms of the slightly different concept of proximate cause.[4] In other words, if a user actually knows of the danger, a failure to warn cannot be a proximate cause of the injury. This is because one who suffers an injury while using a product that he knows may cause personal injury cannot complain that the seller failed to warn him of that which he already knew. Simply put, the law does not require a demonstrably unnecessary gesture. *Strong,* 667 F.2d at 688. (*"Even if [the defendant] was under a duty to warn, its failure to do so could not have been the proximate cause of the accident because NNG [the employer] and the plaintiff's decedent [an employee, who was a supervisor] were aware of the danger."*) (emphasis added). *See also Peitzmeier v. Hennessy Indus., Inc.,* 97 F.3d 293, 300 (8th Cir.1996), *cert. denied* 520 U.S. 1196, 117

3. In its entirety section 388 states:
   Chattel Known to be Dangerous for Intended Use
   One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
     (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
     (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

  (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

4. A supplier of a dangerous product has no responsibility (duty) to warn if the supplier has reason to believe that the experienced user knows *or should know of the danger.* In contrast, proximate cause analysis asks whether the user actually knew of the danger. The two notions are therefore slightly different. However, since the Coop and the plaintiff's decedent had actual and constructive knowledge, this difference does not matter here.

S.Ct. 1552, 137 L.Ed.2d 701 (1997) (same) (quoting *Strong* ); *Hammond v. Nebraska Natural Gas Co.*, 204 Neb. 80, 86, 281 N.W.2d 520, 524 (1979) (a propane explosion; gas company claimed that manufacturer of coupling failed to warn the gas company and thus the gas company was not liable to the owner of a hotel destroyed by the explosion; the court held that the failure to warn "could not have been a proximate cause of the accident if the Gas Co. had actual knowledge of the matter.")

**C. Undisputed Facts Establish that the Coop and Crook Knew or Should Have Known of the Dangerous Condition of the Product and the Methods that Were Available to Protect Themselves.**

■ Viewing the evidence in the light most favorable to the plaintiff, the evidence is undisputed that the Coop and the plaintiff's decedent knew or should have known of the risk of odorant fade and the desirability of detectors because both the employer and the employee-manager were very experienced with propane, the risks associated with this product, specifically including odor fade, and the various protective measures that were available. Moreover, given this presumptive knowledge, both Kaneb and Farmland reasonably believed that warnings were unnecessary. Still further, the actual knowledge of the Coop and the plaintiff's decedent about this information negates any possibility that the failure to warn was a proximate cause of the injury and damage.

The following undisputed evidence is particularly persuasive in establishing that no warning was required and that the alleged failure to give an adequate warning was not a proximate cause of the injury and damage:

1. The Coop, with more than 20 years of experience in storing, handling and using propane, was not a small end-user of propane, maintaining two 18,000 gallon storage tanks, four bulk delivery trucks and reselling propane for residential, agricultural, and industrial uses.

(D. Noble Depo., pp. 9:5–8; 11:14–13:17.) In 1994, the Coop twice made safety representations to Farmland regarding gas. In particular, the Coop represented that it was "familiar with the properties of NGL gas products and safe methods of handling them...". (P. Williams Aff., ¶ 6 and Ex. 18, ¶ 12.) Moreover, the Coop promised to "inform the [Coop's] customers of the same." (*Id.*);

2. The Coop through its employee Noble knew that propane was flammable and explosive. (D. Noble Depo., p. 15:5–22.);

3. The Coop through its employee Noble knew about electronic gas detectors and had used electronic leak detectors in the past. (D. Noble Depo., pp. 33:6–34:9.);

4. The Coop through its employee Noble knew that propane was heavier than air and that propane would collect in low areas such as basements. (D. Noble Depo., pp. 15:5–22; 22:7–19.);

5. The Coop through its employee Noble used its extensive knowledge of propane's characteristics to warn its retail customers concerning the dangers associated with storage and use of propane. (D. Noble Depo., pp. 22:7–19; 26:2–28:4; 28:16–30:10.);

6. The Coop through its employee Noble knew that a leak could occur in the Coop's propane lines, as it had historically performed pressure tests to check for such leaks. (D. Noble Depo., pp. 79:15–81:21.);

7. The Coop through its employee Noble knew that propane was odorless, colorless, heavier than air, which "means that it will go to the lowest point in any certain area," and that propane was "dangerous ... if not handled properly." (D. Noble Depo., p. 15:5–22.);

8. As of 1976, Dan Noble knew that propane "was a pressurized gas and that propane itself in its pure form has no smell, and they add mercaptan to it to

give it that smell so that you are aware of it." (D. Noble Depo., pp. 14:16–15:4.);

9. As of 1976, Dan Noble knew that propane was odorless, colorless, heavier than air, which "means that it will go to the lowest point in any certain area," and that propane was "dangerous . . . if not handled properly." (D. Noble Depo., p. 15:5–22.);

10. In the over 21 years that Dan Noble has been working at the Coop's Gresham facility, the propane delivered to the Coop has always been injected with the odorant ethyl mercaptan, which is "effective in alerting an individual . . . to the presence of propane." (D. Noble Depo., pp. 16:15–17:3.);

11. By June of 1977, Dan Noble knew of the limits of ethyl mercaptan, including the fact that this odorant could filter out or lose its effectiveness when going through soil. (D. Noble Depo., pp. 17:8–19:11.);

12. Dan Noble provided information to the Coop's customers regarding the characteristics of propane and ethyl mercaptan, including that the propane is "heavier than air," and "it's a possibility that if it leaks through the soil that it might not be noticeable by smell." (D. Noble Depo., p. 22:7–19.);

13. As of October 1994, Dan Noble had over 18 years of on-the-job experience with propane, and he had attended numerous safety seminars at which the subject of "odor fade" was addressed. (D. Noble Depo., pp. 19:23–21:17.);

14. Dan Noble was certified prior to 1994 by the National Propane Gas Association, as having "specialized training in the installation of propane piping," and he instructed Coop customers in that regard. (D. Noble Depo., pp. 26:2–28:4; 28:16–30:10.);

15. Before October of 1994, the Coop had in place and used a pressure testing system, which was the "best way" to check for underground gas-line leaks. (D. Noble Depo., pp. 79:15–81:21; R. Rehm Aff., ¶ 4 and Ex. C; R. Stubbs Depo., pp. 115:8–116:4.);

16. Before October 1994, Dan Noble, who attended many safety seminars on the subject, specifically discussed the characteristics of ethyl mercaptan with Mr. Crook, the manager of the Coop, including the idea of odorant fade. (D. Noble Depo., pp. 161:25–162:18; 178:5–21.) Mr. Crook was the person who opened the safety literature on propane that the Coop received. (K. Rhodes Depo., pp. 52:11–56:12.) Mr. Crook's job as manager required him to directly supervise Noble, the "Propane and Grain Serviceman." (Ex. 10 at I.)

### III. CONCLUSION

In summary, after viewing the evidence in the light most favorable to the plaintiff, summary judgment must be granted on the plaintiff's strict liability and negligence theories premised on a lack or insufficiency of warning. This is true for two reasons. First, the defendants had no responsibility to warn because the undisputed evidence establishes that the Coop and the plaintiff's decedent, as a knowledgeable purchaser and user, knew or should have known of the risks and the methods that were available to protect themselves. A warning was therefore unnecessary. Second, because of the actual knowledge of the Coop and the plaintiff's decedent, the failure to warn could not have been a proximate cause of the injury and damage. Therefore, we will enter summary judgment for Farmland and Kaneb.

IT IS ORDERED that the motions for summary judgment (filings 70 and 86) are granted. Furthermore, final judgment will be entered by separate document providing that the plaintiff shall take nothing as against the defendants, this case is dismissed with prejudice and costs shall be taxed to the plaintiff.